JOHN M. TOBIN, individually and as administrator,[1] & another[2]
vs. NORWOOD COUNTRY CLUB, INC.

Suffolk. December 6, 1995. - February 22, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY, &
FRIED, JJ.

*Practice, Civil,* Judgment notwithstanding verdict. *Negligence,* Alcoholic li-
quors, Sale of liquor, Duty to prevent harm, Contributory, Wrongful
death. *Alcoholic Liquors,* Sale to minor. *Proximate Cause. Statute,*
Construction.

At the trial of wrongful death and negligence claims brought against a
commercial establishment (club) that supplied alcoholic beverages, for
injuries suffered by a minor who became intoxicated there, the judge
incorrectly entered judgment for the defendant notwithstanding the
verdicts, where, in the circumstances, the club owed the minor a duty of
care to refrain from making alcohol available to her which was breached
when the club knew or reasonably should have known that it was
furnishing alcohol to minors, measured by the cumulative knowledge of
its employees [132-138], and where there was sufficient evidence, on
proper instructions, for the jury so to have found [138-141]. O'CONNOR,
J., dissenting, with whom LYNCH, J., joined.

General Laws c. 231, § 85, operated to reduce the plaintiffs' recovery on
claims for negligence and wrongful death in proportion to the decedent's
own contributory negligence. [138]

CIVIL ACTION commenced in the Superior Court Depart-
ment on October 20, 1989.

The case was tried before *George A. O'Toole, Jr.,* J.

The Supreme Judicial Court granted an application for
direct appellate review.

*Arthur F. Licata (Kevin P. Conway* with him) for the
plaintiffs.

*Philip E. Murray, Jr. (Lori A. Cianciulli* with him) for the
defendant.

FRIED, J. This case concerns the responsibility of a com-

_____

[1]Of the estate of Julie Tobin.

[2]Catherine Tobin.

mercial establishment that supplies alcoholic beverages, the Norwood Country Club (club), for injuries suffered by a minor who became intoxicated while there. The minor died as a result of those injuries and the plaintiffs brought suit both on behalf of her estate, and on their own account for her wrongful death. A jury found for the plaintiffs on both causes of action, but reduced the verdicts in an amount proportionate to the minor's contributory negligence. The Superior Court judge entered judgment for the defendant notwithstanding the verdict. We granted the plaintiffs' application for direct appellate review. We now reverse the judgment of the Superior Court judge and reinstate the jury's verdicts. Insofar as contributory negligence was allowed to reduce both the estate's and the plaintiffs' recovery, we conclude that the judgment of the Superior Court was correct.

I

A

As we review the propriety of a judgment notwithstanding the verdict, we consider the facts in the record in the light most favorable to the plaintiffs and to the verdicts which the plaintiffs obtained. See *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), citing *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972).

The club is a commercial establishment that among other things serves meals and alcoholic beverages to the general public. It also makes its facilities available for private parties by special arrangement. On September 5, 1987, the club had made one of its rooms available for an evening party intended to combine a family reunion with the eighty-fifth birthday party of one of the family members. Paul Moran, a full-time bartender at the club and a relative of the family, arranged for the use of the function room at the club for the party. The room was supplied free of charge, although the family would pay the club for the drinks consumed at the party. The family made arrangements for a caterer to supply the food. The bar for the party was in a separate room and Moran arranged for Patricia Erwin, a regular bartender at the club, to serve as bartender for the evening so that he could attend the party as a guest. Erwin agreed to work only for tips that evening. Also present during the course of the evening was Michael Mercer,

supervisor of the bartenders. Mercer testified that he had allowed Moran, an employee, to use a room at the club for a private function only reluctantly, that he did not charge for the use of the room, that he had noticed that minors were present, and that he had not been aware that Moran would himself be drinking alcohol that night. There were more people present at the party than the club had expected. At nine o'clock that evening, Moran told Mercer that he could go home and that he, Moran, would take over responsibility for the club in general and the function room in particular.

Moran expected that there would be teenagers at the party and communicated this to Erwin. Moran testified that, though present as a guest, he considered himself to some extent responsible for the party, and in that capacity asked family members to help him police the party to make sure there was no underage drinking. Erwin could not see the function room from the bar, where she was serving the drinks to both the guests at the party and the public guests of the club. She did not enter the function room during the evening to check if there were any alcohol-related problems, as she might on other evenings. She believed Moran to be her manager that evening.

There were between seventy and one hundred guests at the family party, most assigned a place at eight tables of eight. At least six of the guests were minors. The deceased was seventeen years old at the time of the party and came as the date of one of the family members who was sixteen. Four other minors and their adult cousins congregated at one table throughout the evening. In the course of the party, which lasted from seven o'clock until after midnight, the deceased must have consumed a considerable amount of alcohol because it was found that her blood alcohol level was .229, two hours after the accident that caused her death.[3] Moreover, her date, who himself had consumed between five and ten "sea breezes" (a pinkish drink consisting of vodka and grapefruit and cranberry juices), testified that the decedent seemed intoxicated toward the end of the party, and there was testimony that several other teenagers were obviously drunk as the long evening

[3]A blood alcohol level of .08 permits the presumption that one is operating while under the influence of alcohol; when the blood alcohol level of a minor operating a vehicle is .02 or above, the minor's license shall be suspended. G. L. c. 90, § 24 (1) (e) (1994 ed.).

wound down. There was testimony that, although Erwin had a policy, as did the club, of serving only two drinks at a time to a customer, on several occasions during the evening, a customer from the family party came away with several drinks to take to the function room. Erwin testified that she neither served anyone who appeared to be a minor nor saw anyone she did serve hand a drink to a minor. A minor, however, testified that, on at least three occasions, he aided two adults by carrying multiple drinks (on one occasion between nine and twelve sea breezes) from the bar. Moran testified that he did not see minors drinking what he knew to be alcohol, though he admitted that he did not make an effort to investigate what the minors were drinking. He did not communicate with Erwin during the party. There was testimony that the table at which the decedent and her teenage companions were sitting throughout the evening had many empty and half-empty glasses of pinkish liquid, which may have been sea breezes, but may have been just fruit juice.

At the close of the party, the decedent had an argument with her date and left the club on foot. She began walking in the breakdown lane of the highway on which the club was situated. Several of the other teenagers at the party left the party in a borrowed van in search of a place to continue their drinking. When they encountered the decedent walking in the breakdown lane, they stopped the van and tried to persuade her to get in. When she continued to walk on they followed, pulled ahead of her and stopped. The decedent walked in front of the van, pounded on the front hood and then veered diagonally toward the center of the highway. She was struck by a passing vehicle and suffered the injuries from which she died two days later.

B

The trial judge instructed the jury that a "vendor has a duty to use reasonable care to refrain from selling or furnishing alcoholic beverages to a person for that person's consumption when the vendor is on notice that the person is under the legal age for consuming alcohol." The judge then defined "reasonable care" as "[t]he obligation of a person . . . to

behave as a reasonably prudent person using the ordinary degree of care in the circumstances. . . . In your collective judgment, in all the circumstances as you understand them to be, what would the behavior have been of a hypothetically reasonable person, exercising the ordinary amount of care that could be expected from a person?"

The trial judge continued his explanation by defining the term "on notice" as actual knowledge or "enough information that you can say collectively that [the vendor] reasonably ought to have known [it was dealing with a minor]." The judge instructed on breach of the vendor's duty as follows: the duty may be breached if the jury finds that there was "direct contact between the vendor and a consumer across the bar . . . , [or] whether in the circumstances as you find them to have been, there was in effect the same thing as if there were a hand to hand encounter." The judge went on to state what he considered the limitation implicit in this definition of a vendor's duty and of what would constitute its breach:

> "It is not enough, however, for there simply to be a possibility that the person to whom the drink is given may give it to someone improper. In general, there is not liability to be imposed or no duty on the part of a vendor to inquire what disposition a lawful purchaser makes of what the purchaser has obtained . . . . There is no general duty to supervise what happens to the drinks after the point of sale, or to supervise in general the function area.

> "On the other hand, if at the time that the adult legal buyer . . . presents at the bar, the vendor knows or has the equivalent of knowledge that in fact it's not the person standing in front of her that's buying the drink, but it's really, in this case, [the decedent] . . . . [I]f the vendor has that knowledge or information that is the equivalent of that knowledge, that is, is on notice that in fact this is only an intermediary, it's a sham transaction . . . then you would be justified in finding that the duty has been breached."

The judge returned to general principles and charged the jury with their task. "It is up to you to determine whether there was a violation of the duty by determining . . . whether with respect to all the circumstances as you find them the country club acted in a way that was reasonable, that met the standard of reasonable care, the way a reasonably prudent person using ordinary care would have acted, or not."

The jury then asked for a further explanation of the phrase "negligently furnish alcoholic beverages to [the decedent]." The judge instructed:

> "What you are to consider is whether the bartender — the corporation, acting through the bartender, and or any other employees that it may have acted through that night . . . whether the country club did the practical equivalent of directly serving [the decedent] at the bar . . . when the country club was on notice that in fact the drink was going to [the decedent] instead of the person that it was given to."

After the jury returned verdicts for the plaintiffs, both of which the judge reduced by the forty per cent the jury had found to be the decedent's contributory negligence, the judge granted judgment for the defendant notwithstanding the verdicts. The judge agreed with the defendant that there was no evidence that permitted "a conclusion that the defendant sold or delivered alcohol to someone it knew *at the time of sale or delivery* was acting only as an intermediary for [the minor]" (emphasis added). The judge believed that the grant of judgment notwithstanding the verdict was required by *Tiki Hut Lounge, Inc.* v. *Alcohol Beverages Control Comm'n*, 398 Mass. 1001 (1986) (rescript), and *A.C. Cruise Line, Inc.* v. *Alcohol Beverages Control Comm'n*, 29 Mass. App. Ct. 319 (1990). The judge evidently believed that before a duty could be triggered on which liability could rest, the facts must establish "hand to hand" service, or its equivalent, of alcohol to a particular underage or intoxicated person. The judge noted, however, that if he was wrong about this proposition, the

judgment for the plaintiffs should stand as not against the weight of the evidence.[4]

## II

### A

The defendant, in support of the judgment notwithstanding the verdict, argues that under any proper statement of the law, no duty had been triggered by its provision of alcohol to the deceased on the night of her death. The defendant asserts that *Tiki Hut Lounge, Inc., supra,* embodies a proper statement of the law in this circumstance. We disagree. To follow the defendant's suggestion would be to create an exception from the general laws of negligence for commercial establishments selling alcoholic beverages. There is no reason of principle and certainly no reason of policy to justify such an exception.

Our decision in *Tiki Hut* is quite a different case from this one. That case involved a license revocation by the Alcoholic Beverages Control Commission (commission) for an alleged violation of G. L. c. 138, § 64 (1994 ed.). In that case, the only material findings were that commission investigators observed a "youthful appearing nineteen year old female standing near the end of the bar at the [commercial establishment] holding a half full bottle of beer that had been bought for her by an adult patron." *Tiki Hut, supra* at 1001. Although we noted that the commission "[u]ndoubtedly . . . identifies the general purpose of the statute" to "protect both minors and the general public from the risks associated with minors' drinking alcoholic beverages," *id.* at 1002, we

---

[4]The judge noted: "The defendant also asks that, in the event that entry of judgment notwithstanding the verdict should be reversed on appeal, the Court rule, as an alternative matter, that the verdict was against the weight of the evidence and for that reason that a new trial should be had. . . . The Court declines to do so. If it should be considered that there was evidence to support the jury's answer, the answer should stand. This is not a case where there was affirmative evidence to the contrary of the plaintiff's proposition greatly outweighing the plaintiff's evidence. The Court concludes that there was no evidence on the necessary proposition that the defendant knew that it was selling alcohol to [the minor] *at all.* If the Court is wrong and it is determined that there was such evidence, it would stand as sufficient because it would be the only evidence bearing on the issue. In other words, the only evidence to be 'weighed' would be in the plaintiff's favor." (Citations omitted. Emphasis in original.)

declined to accept the commission's proposal that G. L. c.
138, § 34, as amended through St. 1982, C. 627, § 13,
"requires a licensee 'to exercise reasonable . . . care in
preventing the delivery of liquor to a minor,' " since the stat-
ute contains no language requiring the exercise of reasonable
care.[5] This case, however, is not a regulatory case brought
under the statute but a tort action brought under the general
laws of negligence, and foreseeability and reasonableness are
the essence of such a case. See *Brown* v. *Kendall,* 6 Cush.
292, 296 (1850) (ordinary care is "that kind and degree of
care, which prudent and cautious men would use . . . and
such as is necessary to guard against probable danger"). See
also *Bennett* v. *Eagle Brook Country Store, Inc.,* 408 Mass.
355, 358 (1990); *Yakubowicz* v. *Paramount Pictures Corp.,*
404 Mass. 624, 629 (1989).

The initial inquiry, whether the club owed a duty of care to
the minor, is a matter of law. *Yakubowicz, supra* at 629.
Determinations of public policy, especially when a statute
"undoubtedly" identifies such a policy, are highly relevant to
this inquiry. See *id.*; *Michnik-Zilberman* v. *Gordon's Liquor,
Inc.,* 390 Mass. 6, 10 (1983). As we have held, the mere fact
that a minor is consuming alcohol on an establishment's
premises does not trigger a duty to that minor or to those
harmed by the minor's alcohol influenced actions. See
*Yakubowicz, supra* at 632-633 (movie theater did not provide
alcohol that minors drank on premises); *Dhimos* v. *Cormier,*
400 Mass. 504, 506 (1987) (convenience store did not provide
alcohol that minors drank while in parking lot).[6] Where a
commercial establishment sold alcohol to a minor, however,
we did not hesitate to impose a duty of care flowing to the
public. *Michnik-Zilberman, supra* at 7, 10. The recognition of
a duty in this context is reinforced by the Legislature's con-

[5]The Superior Court judge also relied on *A.C. Cruise Line, Inc.* v. *Alcohol
Beverages Control Comm'n,* 29 Mass. App. Ct. 319 (1990), to overturn the
jury verdict. That case, however, is also distinguishable as involving only
an alleged statutory violation.

[6]The circumstances surrounding social host liability, as explained in *Mc-
Guiggan* v. *New England Tel. & Tel. Co.,* 398 Mass. 152, 157-158 (1986),
are different from the considerations we take into account in the case of a
commercial establishment. Thus, our holding today does not disturb any
aspect of our law of social host liability. See *McGuiggan, supra.* See also
*Cremins* v. *Clancy,* 415 Mass. 289 (1993); *Mosko* v. *Raytheon Co.,* 416
Mass. 395 (1993) (employee-host liability); *Ulwick* v. *DeChristopher,* 411
Mass. 401 (1991); *Langemann* v. *Davis,* 398 Mass. 166 (1986).

sistent recognition of the danger of furnishing alcohol to minors. See, e.g., G. L. c. 138, § 34; c. 138, § 34A (false representation of age); c. 138, § 34B (requiring identification cards); c. 138, § 34C (transportation of alcohol by a minor); c. 90, § 24 (1) (*e*). We have not, however, considered whether there can be liability where a commercial establishment furnishes the alcohol to a minor in the absence of an actual "hand to hand" transaction or its equivalent.[7]

A business that makes money by serving liquor where

[7]Courts in other jurisdictions, although not denying that there exists a duty of care in these circumstances, have generally reasoned that the voluntary consumption of alcohol by the intoxicated adult or minor is an intervening cause that precludes the provider's liability. See, e.g., *Megge* v. *United States*, 344 F.2d 31, 32 (6th Cir.), cert. denied, 382 U.S. 831 (1965), and cases cited; *Cruse* v. *Aden*, 127 Ill. 231 (1889); *Pelzek* v. *American Legion*, 236 Neb. 608 (1990). In response, various legislatures have enacted statutes, commonly referred to as dramshop or civil damages acts, specifying the circumstances in which the provider of alcohol can be held liable. Since the enactment of these statutes, the various courts' role, for the most part, has been limited to interpreting those statutes, see, e.g., *Bankston* v. *Brennan*, 507 So. 2d 1385, 1387 (Fla. 1987); *Charles* v. *Seigfried*, 165 Ill. 2d 482, 490 (1995), and cases cited; *Thompson* v. *Ferdinand Sesquicentennial Comm., Inc.*, 637 N.E.2d 178, 180 (Ind. Ct. App. 1994); *Weiner* v. *Gamma Phi Chapter of Alpha Tau Omega Fraternity*, 258 Or. 632 (1971); *Norton* v. *Opening Break of Aiken, Inc.*, 319 S.C. 469 (1995); *Horton* v. *Royal Order of Sun*, 821 P.2d 1167 (Utah 1991), and therefore the causation issue has not been revisited by them. See, e.g., *Pelzek, supra*; *Slager* v. *HWA Corp.*, 435 N.W.2d 349 (Iowa 1989); *Rone* v. *H.R. Hospitality, Inc.*, 297 Ark. 107 (1988). By contrast, the Legislature repealed the Dramshop Act which provided for an express right of action in 1933, see St. 1933, c. 376, § 2, repealing St. 1879, c. 297, § 1 (as amended by St. 1880, c. 239, § 4, and c. 256, § 1), and this court found that the act of providing alcohol could serve as the proximate cause of an injury resulting from that provision of alcohol. *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498 (1968). Thus, this court's role in these circumstances has not been limited in the manner that the other State courts have been. Partially as a result of the *Adamian* decision, this court has maintained its role in the development of the law in this area. The Legislature has acted only to limit liability in certain specified instances rather than to delineate in a general way where it might lie. See G. L. c. 231, § 85T.

Arizona has approached this matter as we have and do now. See *Estate of Hernandez* v. *Arizona Bd. of Regents*, 177 Ariz. 244 (1994); *Petolicchio* v. *Santa Cruz County Fair & Rodeo Ass'n*, 177 Ariz. 256 (1994). *Where a minor stole alcohol from a licensed liquor provider, the Arizona Supreme Court, in Petolicchio*, construed statutes immunizing certain providers of alcohol narrowly and recognized a cause of action based on common law principles of negligence.

teenagers are known to be present is not engaging in an ultra-hazardous activity, but the situation is so fraught with foreseeable risk that a business that is in a position to control or reduce that risk has a duty to do so. That a statute regulating the same risk has been construed narrowly to require something like "hand to hand" contact before a vendor is liable for a regulatory sanction, does not dispose of the question whether the common law duty of care may require something more. The risk here is great and commonly known to be great. The vendor is in the business of supplying the substance that creates the risk, and it has the experience and opportunity to take steps to minimize it. In other situations where these factors are present, we do not hesitate to impose a duty of care on a person who participates in the creation of a known or knowable risk and who is well situated to mitigate it. See, e.g., *Simmons* v. *Monarch Mach. Tool Co.*, 413 Mass. 205, 211 (1992) (duty to design product so as to eliminate avoidable damages); *Pudlo* v. *Dubiel*, 273 Mass. 172 (1930) (imposing duty of care on seller of B.B. gun to a minor for the injuries caused by gun to minor); *Carter* v. *Towne*, 98 Mass. 567 (1868) (holding licensed gunpowder seller liable for harm caused by providing gunpowder to an eight year old boy). See generally Restatement of Torts § 390 (1965). There is at least as much reason to do so here.

For these reasons, we hold that in the circumstances of this case the club owed the deceased minor a duty of care to refrain from making alcohol available to her, an act that unreasonably increased the risk of harm to her. The triggering of the duty is not limited to the circumstance of hand to hand selling or serving of alcohol as the Superior Court judge held. The duty is breached when the establishment knew or reasonably should have known that it was furnishing alcohol to minors. The club's knowledge is measured by the cumulative knowledge of its employees. That the standard is formulated to include what the establishment "reasonably should have known," permits the jury to hold the establishment to the knowledge it should have had, had it taken reasonable precautions to prevent minors from drinking alcohol. If the jury find that the establishment knew or reasonably should have known that the establishment was furnishing alcohol to minors, the establishment has breached its duty of care and, if causation is established, may be held responsible

for the injuries and damage caused by the minor's alcohol-influenced actions, whether to the minor or to others.

We must also consider the bearing of G. L. c. 231, § 85T (1994 ed.), on this case. Section 85T provides:

> "In any action for personal injuries . . . caused by or arising out of the negligent serving of alcohol to an intoxicated person by a licensee . . . , no such intoxicated person who causes injuries to himself, may maintain an action against the said licensee . . . in the absence of wilful, wanton, or reckless conduct on the part of the licensee . . . ."

By our reasoning above, the club was found negligent in furnishing liquor to the decedent, who was seventeen years old. There is, therefore, a reading of the statute on which the club is absolved from liability to her for what the statute otherwise assumes might be its negligence — i.e., the club served alcohol to her when she was intoxicated. We think that this is neither a necessary nor even the more plausible reading of the statute.

The statutory provisions regulating the serving of liquor, G. L. c. 138, § 34, § 69, as well as our cases, *Michnik-Zilberman, supra* at 10; *McGuiggan, supra* at 158-159, refer to two classes of persons, intoxicated persons and minors, service to whom is the subject of special concern and the basis of regulatory action or liability. The situations of those two classes are quite different. A person who is already intoxicated has voluntarily put himself in that condition, and the law is concerned that a vendor not prolong or worsen that condition. By contrast, the law forbids the serving of alcohol to minors because they are thought to be peculiarly susceptible to the effects of alcohol and less able to make decisions about what amount of alcohol they may safely consume in various situations. Thus the focus of the second prohibition is more strongly paternalistic. Section 85T reflects the Legislature's unwillingness to allow a person who has voluntarily and responsibly put himself into a condition where his judgment and functioning are impaired to cast the blame on others, when he suffers injury as a result of that condition. That is a moral and a policy judgment that does not extend to furnishing alcohol to minors.

Our decisions under § 85T are not to the contrary. In *Manning* v. *Nobile*, 411 Mass. 382 (1991), an adult sought to recover from both a commercial licensee and a social host. As to the commercial establishment, the literal terms of the statute applied, and as to the social host, our decision rested on the difference between social hosts and commercial vendors, a distinction we do not disturb here. Commercial establishments have a financial incentive that liability may operate to offset; they have the experience and means to monitor alcohol consumption more closely; and they are in a better position to insure against any liability the law may impose. *Id.* at 391. Accord *McGuiggan, supra* at 157-158. In *Hamilton* v. *Ganias*, 417 Mass. 666 (1994), in which the defendant was a social host, the injured plaintiff was nineteen years old. What we said in that case, far from contradicting our decision here, supports it:

> "We decide this on the broad principle that [the plaintiff], although an underage drinker, was an adult . . . , who was responsible for his own conduct and injured himself. The Legislature has granted substantial rights to and has placed substantial obligations on people who are nineteen years old. [The plaintiff] was old enough to vote . . . , to make a valid will . . . , to enter into valid contracts . . . , to get married without parental consent . . . , to serve on a jury . . . , to work in any job . . . , for as many hours as he wished . . . , to buy and carry a firearm . . . , and to be treated as an adult in the criminal justice system" (footnote and citations omitted).

*Id.* at 667-668. All these reasons support the recognition of the duty of care we find in this case; nor does the fact that the statutory drinking age is greater than that for the many circumstances we mention in *Hamilton* suggest that the distinction between minors and adults is irrelevant in determining the scope of § 85T. When we have a case like *Hamilton*, but involving a commercial licensee, will be time enough to determine which definition of adulthood covers the duty we find here. In this case, the decedent was clearly a minor by either definition. If she had been not age seventeen but age twelve, our decision would, we suppose, seem inevit-

able. In these matters the law operates by steps and not infinite gradations, and legal majority — or perhaps the legal drinking age — represents an appropriate next step.

## B

Because we apply the general law of negligence here, it is wholly appropriate that the principle of contributory negligence apply in full force to reduce any liability. Certainly the recovery on behalf of the decedent's estate is appropriately reduced by the decedent's own contributory negligence. The question is raised whether the plaintiffs' wrongful death action is similarly affected. The plaintiffs argue that, since theirs is an independent action based on their own loss, the decedent's contributory negligence should not operate to reduce their recovery, and they adduce two Superior Court memoranda that support their position. Whatever the logical force of this argument, G. L. c. 231, § 85 (1994 ed.), which addresses "any action by any person or legal representative to recover damages for negligence resulting in death or injury to person or property," specifically provides that "any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose . . . death recovery is made."

The language of the statute is plain and leaves no room for the plaintiffs' argument. The Superior Court judge below correctly ruled that all damages, not just those of the estate on behalf of the decedent herself, must be reduced in accordance with c. 231, § 85. See generally Annot., 25 A.L.R. 4th 118, at § 3 (1983) (collecting cases that reach the same conclusion).

## III

The instructions as given were, if anything, more generous to the defendant than if the judge had kept to the general law of negligence, and accordingly, the jury's verdict must stand. The judge's memorandum allowing the judgment notwithstanding the verdict, indicates that he intended to give instructions that were narrower than the ones he actually gave. In his memorandum, he summarized the instructions as permitting the jury to find a duty owed if the club "sold or delivered alcohol to another person when it knew or in the exercise of reasonable care ought to have known that that person was acting for a minor or intoxicated person so that the sale or

delivery to the intermediary was in effect a sham *and* the equivalent of a direct sale to the minor or intoxicated person by the defendant" (emphasis added). When this standard is compared to the instructions as given, it becomes apparent that the instructions as given were sufficiently consistent with the law as we have recognized it in this opinion to allow the jury's verdict to stand, so long as there is sufficient evidence to support the jury's verdict under those instructions.

The party began at approximately 7 P.M. and lasted until after midnight. Moran was present in the function room throughout the evening, and a jury might have concluded that he acted in the dual role of guest and representative of the club.[8] There was testimony that the party was awash in alcohol, that agents of the club knew that there were several teenagers present, and that over the course of the evening the six teenagers, including the decedent, drank more than forty glasses of a pinkish liquid. Of course, that liquid might have been fruit juice, but it is a reasonable inference from the testimony — to say the least — that an experienced observer might have supposed that some of these were "sea breezes," a concoction specifically obtained by the minors to look like something less potent. There was testimony that, from the behavior of some of the teenagers, an experienced observer might have inferred that they had been drinking, and drinking more than a little. In these circumstances, we conclude that a jury could find that the club knew or reasonably should have known that it was furnishing alcohol to the deceased minor.[9]

There may not have been enough evidence to allow the jury to conclude that Erwin knew or had reason to know that any particular drink was reaching a particular minor. Perhaps even Moran was not shown to have seen an adult hand a drink to a minor or even seen a minor lift what Moran should

[8]Other than at the beginning of the night and after the guests had left, Moran and Erwin never communicated. The jury could have concluded that it was negligent for the two employees on duty that night, one in the function room and one at the bar, not to communicate.

[9]The jury could have concluded that the alcohol that the club provided the deceased minor, particularly in light of her .229 blood alcohol level two hours after the accident, caused her injury and ultimately her death.

have known was alcohol to his or her lips.[10] But the duty of care does not require such specificity, and, regardless of the judge's intentions, neither did his instructions. From the evidence, a jury could have concluded that the club breached its duty and that causation was established under the instructions as given. The evidence reveals that the club relaxed its normal procedures to accommodate a family party of one of its employees, something the club had never done before. Mercer allowed the family to use the room free of charge, and more guests showed up than the club expected. In violation of club policies, Erwin sold multiple drinks on numerous occasions, and on at least three occasions permitted a minor to carry drinks from the bar. The record also indicates that on another occasion, the club had set up a bar in the function room so that the bartender could monitor the guests; on this night they decided not to.[11] On other nights, the bartender walks through the function room; on this night only Moran entered the room.[12] Finally, in violation of club rules, Moran drank at least three alcoholic drinks while on duty. Yet, the club and Erwin, working only for tips, maintained a financial incentive to serve as many drinks as were ordered.[13]

---

[10]Moran testified that he observed plastic cups with pinkish liquid in them on the table at which the minors sat during the course of the evening. The jury could have disbelieved his statement that he never observed minors drinking what he knew to be sea breezes.

[11]There was testimony that the club regularly offered such an accommodation to private parties.

[12]Mercer, the supervisor of the bartenders, stated that the bartender's responsibility is, whenever he or she has a chance, to stroll through the party and make sure everything is being done according to the club's policies. That the bartender failed to make this chance knowing that minors were present could have been considered negligent behavior by the jury. There was also testimony that it was the common policy and procedure of the club to make special arrangements for the supervision of minors to make sure that they would not be served alcoholic beverages. The club's assignment of Moran to this task when it was his family members that he was to supervise could have been considered negligent by the jury.

[13]By our decision, we do not impose strict liability on the vendor in such cases. In most situations, appropriate procedures and actions on the basis of those procedures will discharge the establishment's duty, and it appears that the club, like many such establishments, had such procedures in place. See, e.g., Michnik-Zilberman v. Gordon's Liquor, Inc., 390 Mass. 6, 11 (1983) (assessing the reasonableness of a liquor store's procedures); Yakubowicz v. Paramount Pictures Corp., 404 Mass. 624, 632 (1989) (commenting on the reasonableness of a theatre's procedures for keeping alcohol out of its theatres). The record supports a finding that the club simply failed to follow them.

We adduce these practices not to establish, as the dissent interprets our opinion, the defendant's negligence. We rely neither on the defendant's own practices nor even on industry standards for our conclusion that the jury might properly have found negligence here. Negligence is based, as the dissent agrees, on reasonable foreseeability of harm, the availability of reasonable measures to avoid that harm, and the failure to take those measures. The defendant's own usual practices — which perhaps are usual in the industry — only serve to confirm our conclusion that the club was generally aware of the risks inherent in the sale of alcoholic beverages and believed itself under a duty to minimize them. But even if the defendant had never followed such practices, the record offers sufficient facts to have allowed a jury to conclude that the defendant, through its agent Moran, knew or should have known — certainly long before the party came to an end and the several drunken teenagers were leaving — that there had been considerable underage drinking. Without having to specify the precise point at which this should have been evident or what precisely should have been done at the end of the party or at some earlier time, it is clear that Moran did nothing to head off the tragedy that eventually — and foreseeably — occurred. At an earlier point in the evening the underage drinking should have been shut down. By the end of the evening, Moran might have enlisted the adults present to monitor the teenagers' departure, since that was the occasion of real and obvious danger. His negligence, which is the negligence of the defendant, depends therefore on no practices or industry standards but on the foreseeability of harm and failure to take any measures to avoid it.

The judgment notwithstanding the verdict shall be vacated and the jury verdict reinstated.

*So ordered.*

O'Connor, J. (dissenting, with whom Lynch, J., joins). " 'Negligence, without qualification and in its ordinary sense, is the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance and fore-

thought which, in the discharge of the duty then resting on him, the person of ordinary caution and prudence ought to exercise under the particular circumstances. It is a want of diligence commensurate with the requirement of the duty at the moment imposed by the law.' *Altman* v. *Aronson*, 231 Mass. 588, 591 (1919). Ordinarily, where a duty of care is established by law, the standard by which a party's performance is measured is the conduct expected of an ordinarily prudent person in similar circumstances. The standard is not established by the most prudent person conceivable, nor by the least prudent, but by the person who is thought to be ordinarily prudent. . . . The same standard is frequently expressed in terms of 'reasonable care,'. . .'' (citations omitted). *Toubiana* v. *Priestly*, 402 Mass. 84, 88 (1988).

"In determining whether the law ought to provide that a duty of care is owed by one person to another, we look to existing social values and customs, and to appropriate social policy. *Schofield* v. *Merrill*, 386 Mass. 244, 246-254 (1982). A basic principle of negligence law is that ordinarily everyone has a duty to refrain from affirmative acts that unreasonably expose others to a risk of harm. Thus, we have held that a keeper of a tavern owes to travelers on the highway a duty of care with respect to the furnishing of alcoholic beverages to his customers, *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 327 (1982); *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498 (1968), and the proprietor of a liquor store owes a duty of care to the public which may be violated by selling liquor to minors, *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 10-12 (1983)." *Yakubowicz* v. *Paramount Pictures Corp.*, 404 Mass. 624, 629-630 (1989).

I agree with the court that the Norwood Country Club owed the deceased minor, who was a guest at the club, a duty to refrain from conduct that would unreasonably expose her to a risk of harm, including a risk of bodily injury or death, as a consequence of her consumption of alcoholic beverages provided by the club. Thus, if there had been evidence that, in violation of G. L. c. 138, § 34, a club employee sold or delivered alcoholic beverages to the deceased minor the jury would have been warranted in finding negligence. However, there was no such evidence in this case. Indeed, there was no evidence that any club employee knew that minors were obtaining alcoholic drinks from any source. The question in

this case, then, is whether, on any reasonable view of the evidence most favorable to the plaintiffs, the jury would have been warranted in finding that the club's employees' failure to make a timely discovery of the deceased minor's consumption of alcoholic beverages and to prevent its continuation and therefore the tragedy that ensued was due to the employees' lack of ordinary prudence. I would answer that question, "No." I would affirm the judgment for the defendant.

In reaching the opposite conclusion, the court states that the employees knew there were teenagers at the party, that over the course of the evening (five hours plus) the deceased minor and five other teenagers "drank more than forty glasses of a pinkish liquid [which] might have been fruit juice," and that "it is a reasonable inference . . . that an experienced observer might have supposed that some of these were 'sea breezes,' a concoction specifically obtained by the minors to look like something less potent." *Ante* at 139. The court also says that "[t]here was testimony that, from the behavior of some of the teenagers, an experienced observer might have inferred that they had been drinking, and drinking more than a little." *Ante* at 139. In a footnote, *ante* at 140 n.10, the court states, "Moran testified that he observed plastic cups with pinkish liquid in them on the table at which the minors sat during the course of the evening. The jury could have disbelieved his statement that he never observed minors drinking what he knew to be sea breezes."

"In violation of club policies," the court states, "Erwin sold multiple drinks on numerous occasions, and on at least three occasions permitted a minor to carry drinks from the bar. The record also indicates that on another occasion, the club had set up a bar in the function room so that the bartender could monitor the guests; on this night they decided not to. On other nights, the bartender walks through the function room; on this night only Moran entered the room. Finally, in violation of club rules, Moran drank at least three alcoholic drinks while on duty." *Ante* at 140. In a footnote, the court cites testimony that "the bartender's responsibility is, whenever he or she has a chance, to stroll through the party and make sure everything is being done according to the club's policies. That the bartender failed to make this chance knowing that minors were present could have been considered negligent behavior by the jury. There was also

testimony that it was the common policy and procedure of the club to make special arrangements for the supervision of minors to make sure that they would not be served alcoholic beverages. The club's assignment to Moran of this task when it was his family members that he was to supervise could have been considered negligent by the jury." *Ante* at 140 n.12.

In summation, the court observes that "the record offers sufficient facts to have allowed a jury to conclude that the defendant, through its agent Moran, knew or should have known — certainly long before the party came to an end and the several drunken teenagers were leaving — that there had been considerable underage drinking." Apparently relying exclusively, or at least primarily, on Moran's failure "to head off the tragedy that eventually — and foreseeably — occurred" and on his failure to "enlist[ ] the adults present to monitor the teenagers' departure," the court concludes that the judgment notwithstanding the verdict should be vacated and the jury verdict reinstated. *Ante* at 141.

Before discussing the court's rationale, it is important that the record be set straight regarding the contents of the evidentiary record: (1) The court's statement that there was evidence that on at least three occasions the bartender permitted a minor to carry drinks from the bar may suggest that on the strength of that testimony the jury would have been warranted in finding that on those occasions the bartender sold or served alcoholic drinks to a minor or minors. However, the court's statement of the testimony is incomplete. Earlier in its opinion the court more fully and more accurately states: "A minor . . . testified that, on at least three occasions, he aided two adults by carrying multiple drinks . . . from the bar." Clearly, the jury would not have been warranted by that evidence, or any other, in finding that the bartender sold or served drinks to a minor. (2) The court writes, "The record also indicates that on another occasion, the club had set up a bar in the function room so that the bartender could monitor the guests; on this night they decided not to." *Ante* at 140. I agree that there was evidence that, on one prior occasion, the club set up a bar in the function room. There was not a shred of evidence, however, concerning why that was done. Specifically, there was no evidence that it was done on that occasion to enable the bartender to monitor the guests.

Most importantly, there was no evidence that it was done because the club "was generally aware of the risks inherent in the sale of alcoholic beverages and believed itself under a duty to minimize them." *Ante* at 141.

The court appears to conclude that, standing alone, the bartender's failure to "make the chance" to stroll "through the party" and monitor it, and the club's assignment of Moran to supervise the minors "when it was his family members that he was to supervise" would warrant findings of negligence. The court offers no explanation — understandably — because a finding of negligence or causation would not have been warranted by that evidence.

The court, of course, does not limit its discussion to the evidence discussed in the preceding paragraph. The court appears to reason also that the jury would have been warranted in concluding that an ordinarily prudent commercial host of a large party similar to the party involved here (a wedding reception, for example) would recognize and then fulfil an obligation not only to refrain from selling or serving alcohol to minor guests or to respond to known alcohol consumption by minors, but also to police the party with a view to detecting whether minors are obtaining alcoholic drinks from adult relatives or friends. The court does not discuss how in this case the ordinarily prudent monitor would have made this discovery since it was not visually apparent from the glasses used by the minors. The court simply implies without explanation that the jury would have been warranted in concluding that ordinary prudence required something more than visual inspection — interrogation of the guests, perhaps (which might or might not have been successful) — or perhaps Moran's sipping from the minors' glasses and, upon discovering alcohol, taking action, the nature of which the court leaves undefined. I simply do not agree with the court's statement that "the record offers sufficient facts to have allowed a jury to conclude that the defendant, through its agent Moran, knew[1] or should have known — certainly long before the party came to an end and the several drunken teenagers

---

[1]The court says, *ante* at 140 n.10, "The jury could have disbelieved [Moran's testimony] that he never observed minors drinking what he knew to be sea breezes." Such disbelief, of course, would not by itself warrant a finding that Moran did observe minors drinking what he knew to be sea breezes.

were leaving — that there had been considerable underage drinking." *Ante* at 141. Surely, the testimony of the deceased's date, who had participated with the deceased and others in the consumption of camouflaged alcoholic drinks, that "the decedent seemed [to him] intoxicated towards the end of the party," and the testimony of another teenager that other teenagers appeared to him to be somewhat intoxicated, would not have warranted the jury in concluding that "[a]t an earlier point in the evening the underage drinking should have been [discovered and] shut down" by Moran.[2] *Ante* at 141.

I conclude this separate opinion with one last observation. Hopefully, the court's decision to reinstate the jury verdict for the plaintiffs does not depend on the sufficiency of the evidence to warrant the jury in finding that Moran was negligent because, "[b]y the end of the evening, [he] might have enlisted the adults present to monitor the teenagers' departure" and he negligently did not do so. Such speculation would be inappropriate.

In my view, the result reached by the court is unjustified. It is unfair to the defendant and suggests that, in the future, clubs, innkeepers, restaurants, bars, hotels and other purveyors of alcoholic beverages may be held liable for injuries sustained in circumstances not realistically within their control.

---

[2]James Foley testified that he could tell his brothers were "buzzed" that night "[b]y their actions . . . They were laughing about — they were laughing, having a good time, giddy, as it may be. They were . . . just looked like they were having — they were having fun, and they didn't really pay too much attention to what they were saying or doing in terms of — they just thought everything was funny." However, my review of the record failed to disclose any testimony that "other teenagers were obviously drunk as the long evening wound down." *Ante* at 128-129. In any event, even if there had been such testimony, the jury would not have been warranted in concluding that "[a]t an earlier point in the evening the underage drinking should have been [discovered and] shut down" by Moran.