GARY T. CHRISTOPHER[1] *vs.* FATHER'S HUDDLE CAFÉ, INC.,
& another.[2]

No. 00-P-482.

Suffolk. March 22, 2002. - January 28, 2003.

Present: DUFFLY, KASS, & TRAINOR, JJ.

*Negligence,* Tavern, Wrongful death, Consumption of alcoholic liquors by
minor guest, Proximate cause. *Wrongful Death. Proximate Cause. Alcoholic
Liquors,* Sale to minor.

Statement of the elements of liability for negligent conduct. [222]
In a civil action arising from the death of a patron of the defendant tavern
who was struck by a car as he fled an altercation with other patrons of the
tavern, which altercation took place off the tavern's premises, the tavern's
duty to protect the decedent patron did not end as soon as he left the
tavern, but rather extended to all reasonably foreseeable harm; where the
tavern was on notice that antagonism between its patrons had festered to
the point of violence, this knowledge, coupled with the observation of the
tavern's doorman of a fight erupting outside, triggered a duty to take
reasonable steps to prevent foreseeable harm by calling the police, which
duty the tavern breached. [222-226]
In a civil action arising from the death of a patron of the defendant tavern
who was struck by a car as he fled an altercation with other patrons of the
tavern, which altercation took place off the tavern's premises, the evidence
was sufficient to support the jury's finding that the tavern's negligence
proximately or legally caused the patron's death, in that, after learning that
there would be a fight between patrons who had earlier displayed animos-
ity (assisted by underage patrons who had been served alcohol and had
become pugnacious), the tavern's doorman observed that a fight had indeed
begun and failed to call police. [226-228]
In a civil action arising from the death of a patron of the defendant tavern
who was struck by a car as he fled an altercation with other patrons of the
tavern, which altercation took place off the tavern's premises, the question
of the decedent patron's negligence was a question for the jury, who were
warranted in finding that the decedent patron's negligence was not a
substantial factor in causing his own death. [228-229]

[1] Individually and as administrator of the estate of Thomas D. Christopher.
[2] Café Enterprises, Inc. Summary judgment entered in favor of other named
defendants — trustees of the 822 Beacon Street Realty Trust, as well as Barry
Bornstein in his individual capacity — and various other third-party
defendants. There was no appeal from those judgments.

A corporation that provided management services to a tavern was not liable for negligence in a civil action arising from the death of a patron of the tavern who was struck by a car as he fled an altercation with other patrons of the tavern, where there was no evidence that the corporation's employees created or contributed to the prohibited service of alcohol to underage patrons or to the circumstances that allowed patrons of the tavern to become violent. [229-230]

In a civil action arising from the death of a patron of the defendant tavern who was struck and killed by a car as he fled an altercation with other patrons of the tavern, which altercation took place outside the tavern, the evidence was sufficient to support a jury verdict that the tavern was grossly negligent, justifying an award of punitive damages, where the jury could have concluded that the tavern, through its employees, had consistently ignored its legal obligation by repeatedly admitting minors into the tavern, and that the tavern's neglect of its legal obligation to summon police when it was clear that there would be a fight was exacerbated when the tavern's doorman demonstrated indifference to the danger to others by remaining at the door for several minutes as a passive observer while the patrons fought on the sidewalk and in the street. [230-231]

CIVIL ACTION commenced in the Superior Court Department on November 17, 1994.

The case was tried before *Linda E. Giles*, J.

*Carolyn M. Conway* for the defendants.

*Marianne C. LeBlanc* (*Benjamin R. Zimmermann* with her) for the plaintiff.

DUFFLY, J. A jury returned verdicts for the plaintiff on claims that the defendants' negligent operation of a tavern proximately caused the death of Thomas Christopher, who was struck by a car as he fled an altercation with patrons of the tavern that took place outside.

## BACKGROUND

1. *Proceedings.* The plaintiff sought recovery for wrongful death under G. L. c. 229, § 2. We construe the plaintiff's case as arising from the alleged breach of the duty to protect tavern patrons from harm and the duty not to sell alcoholic beverages to underage persons. See *Pucci* v. *Amherst Restaurant Enterprises, Inc.*, 33 Mass. App. Ct. 779, 780 n.2 (1992). Upon general verdicts, the jury found Father's Huddle Café, Inc.,

and Café Enterprises, Inc., negligent and grossly negligent.[3]

The trial judge denied the defendants' motions for directed verdicts made at the close of the plaintiff's case and renewed after the defendants rested; denied a request that the jury be specially instructed to return separate verdicts on each of the plaintiff's theories of negligence; and denied the defendants' motions for judgment notwithstanding the verdicts. The defendants appeal the denial of their motions for directed verdicts and the denial of their motions for judgment notwithstanding the verdicts.[4]

2. *Facts.* "[I]n reviewing the denial of the defendant[s'] motions for directed verdict and judgment notwithstanding the verdict, we will construe the evidence most favorably to the plaintiff and disregard that favorable to the defendant[s]." *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326 (1982). See *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 16 (1998). We sustain a jury verdict if there is anywhere in the evidence any combination of circumstances from which a reasonable inference could be drawn supporting the verdicts. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 7 n.1 (1983); *McCartin* v. *Westlake*, 36 Mass. App. Ct. 221, 224 (1994). Although the question is a close one, the issues of negligence and causation are most appropriately left to the jury, and there is enough in the evidence to support the jury verdicts as to Father's Huddle Café, Inc.

The evidence, in summary, warrants finding that Frederick

---

[3]In addition to funeral and medical expenses, the jury awarded $1.5 million in compensatory damages to each of Christopher's parents and assessed $15 million in punitive damages against Father's Huddle Café, Inc., and $10 million in punitive damages against Café Enterprises, Inc.

[4]The defendants argue that there was no duty of care owed to Christopher that the defendants failed to perform, and that the evidence did not establish that any negligence of the defendants was the proximate cause of Christopher's death. Even if there was negligence, they argue that the actions of Christopher and his friend Robert McFadries in returning to the scene to fight when they might have remained uninvolved constituted a superseding cause of Christopher's death. The defendants claim that the evidence was insufficient to establish gross negligence. Finally, they argue that on the theories advanced by the plaintiff, the evidence was insufficient as to Café Enterprises, Inc., even if sufficient to support a verdict against Father's Huddle Café, Inc.

Callinan, head doorman at Father's Too[5] on the evening of September 8, 1992, was responsible for checking identification of all persons seeking entry to the tavern to make sure that no one was admitted who was under the age of twenty-one, the legal age for drinking alcohol, and for exerting control and preventing or stopping fights involving patrons.[6] Thomas Christopher and his friend, Robert McFadries, then both twenty-three years old, arrived at the tavern at approximately 8:30 P.M. to drink beer and watch a ball game on television. Throughout the evening they sat near Callinan, who stood inside the door. While at the tavern, they ate hot dogs and drank a couple of pitchers of beer between them. At approximately 10:00 P.M., a group arrived that included Kevin Baker and Matthew Lombard, both eighteen years old. They knew that, despite their ages, they could get in and drink alcohol. Baker, often accompanied by Lombard, had been a regular patron since he was sixteen and had, since that date, been admitted to the tavern two hundred times. Each carried only an authentic driver's license, which he showed to the doorman when requested, and neither was ever denied entry in spite of the fact that the license identified him as under the age of twenty-one. On the night in question they displayed their licenses to Callinan — who knew Baker as a patron — and were admitted, as expected, along with David Ellis, who was twenty-six, and one or two others also not underage. All of them consumed alcohol while at the tavern.

McFadries knew Ellis, a former high school classmate. The doorman, Callinan, observed unpleasant looks pass between El-

---

[5]Father's Huddle Café, Inc., owns a tavern at Beacon Street, Boston, which, prior to trial, it operated under the business name "Father's Too." The doormen, bartenders, wait staff and on-site manager are all employees of Father's Huddle Cafe, Inc. Café Enterprises, Inc., is in the business of providing management services to restaurants, including Father's Too. The services provided by Café Enterprises, Inc., include payroll preparation, purchase of supplies and liquor, employee training, and management oversight.

[6]There was also evidence that the head doorman was instructed to take photographs of patrons with identification indicating an age of twenty-six or younger, and to deny entry to anyone appearing intoxicated. Although there is no legal requirement that taverns deny entry to those under the age of twenty-one, here, because the tavern sought to limit opportunities for underage drinking, it depended on its doorman, not the bartender, to "card" its patrons.

lis and McFadries and overheard them exchange words; he was told by McFadries that he had had a fight with Ellis in high school. Forty-five minutes later, when Callinan saw Ellis and a companion (known as "Boots") get up quickly to follow Christopher and McFadries out the door, he knew that something was going on and suspected a fight was brewing. Moments later, as Baker and Lombard also prepared to leave, Callinan stopped them to ask if there was going to be a fight. Baker confirmed that they "were going out to rough someone up."

When Baker and Lombard exited the tavern, they observed Ellis and Boots at the corner of Beacon and Mountfort Streets, some fifty yards away; the Ellis group then started shouting. A car, which had made a U-turn and was then headed in the direction of the tavern, stopped near Ellis.[7] McFadries got out of the car and ran to where Ellis stood on the sidewalk. Fighting commenced and Baker and Lombard went to join them; they began to beat McFadries with brass knuckles.

Callinan stepped outside the door when Baker and Lombard left the tavern to join in the fighting. He was, he said, "checking to see if [McFadries and Christopher] were going to be okay, you know; so I stood in the doorway and I looked up. There was no way I was going to be able to hold back these four kids from leaving the bar. I mean, I wouldn't do that, you know. So I just wanted to see if they were really going to do what they wanted to do, and they did." Callinan, who apparently did not see Christopher and McFadries get in or out of their car, continued to watch as Baker and Lombard left the tavern to join Ellis and Boots in beating McFadries. Although estimating that the fighting at the corner was about fifty yards away, it was sufficiently close that Callinan was able to recognize each of the participants and their various roles in the escalating violence. He watched Christopher — who had by then parked his car, approached those involved in the fighting,

[7] Callinan apparently did not observe that, after leaving the tavern, Christopher and McFadries walked to where they were parked on Beacon Street on the inbound direction headed away from the tavern; that they then got in and were driving by a route that took them back in the direction of the tavern when McFadries saw Ellis and Boots standing on the corner, gesticulating and making loud noises; and that Christopher stopped the car and McFadries got out and ran toward the Ellis group.

and returned to his car to retrieve a hockey stick, which he then brandished — as he yelled at the group to back off and get away from McFadries. Callinan continued watching — at one point hopping up on a low wall to get a better look — and could see as Baker and Lombard turned their attentions from McFadries to Christopher and began punching, then kicking him. They flanked Christopher and Lombard moved behind him and grabbed the hockey stick; Christopher was knocked to the ground. He got up and was chased by Baker and Lombard across the outbound lane of Beacon Street and onto the median strip; at some point Ellis was also involved in chasing after Christopher, who ran in a zig-zag fashion into the inbound lane of Beacon Street, then back in the direction of the tavern and into the outbound lane of traffic where he was struck by a moving vehicle. He died as a result of his injuries.

The jury could have found that, from the moment Baker and Lombard left to join in the fighting to the point at which Christopher was hit by a car, up to ten minutes had elapsed during which Callinan stood watching. When police were finally called, they arrived within two to three minutes.

## DISCUSSION

1. *Legal Framework.* To be liable for negligent conduct, one must have failed to discharge a duty of care owed to the plaintiff, harm must have been reasonably foreseeable, and the breach or negligence must have been the proximate or legal cause of the plaintiff's injury. See *Stamas* v. *Fanning*, 345 Mass. 73, 75-76 (1962); *Tobin* v. *Norwood Country Club, Inc.*, 422 Mass. 126, 141 (1996). We proceed to discuss the basis for our conclusion that the evidence supported findings of negligence on the part of the tavern,[8] and that the judgment entered against Father's Huddle Café, Inc. (Father's Too), on the basis of the jury verdicts should be affirmed.[9]

2. *Breach of duty.* Father's Too concedes that a tavern has a duty of reasonable care to prevent foreseeable harm to its patrons. Pertinent to this case, that duty has been found to exist

---

[8]We will discuss, *infra*, the basis for our conclusion that Café Enterprises, Inc., is not liable.

[9]We see no error in the judge's denial of the defendants' request that the jury be specially instructed to return separate verdicts on each theory of negligence.

where patrons suffer injury on the premises as the result of acts of other patrons, see *Westerback* v. *Harold F. LeClair Co.*, 50 Mass. App. Ct. 144, 146-147 (2000) (citing cases), or where the intoxication of a patron pedestrian leads to that patron's death away from the premises where alcohol was served. See *Tobin* v. *Norwood Country Club, Inc.*, 422 Mass. at 129, 135.[10]

The tavern also had a duty not to serve alcohol to minors. See *Tobin* v. *Norwood Country Club, Inc.*, 422 Mass. at 136 (service of alcohol to minors "is the subject of special concern and the basis of regulatory action or liability"). See also G. L. c. 138, § 34; G. L. c. 231, § 60J.[11] Where a commercial establishment sells alcohol to an underage drinker, we do not hesitate to impose a duty of care flowing to the public. See *Tobin* v. *Norwood Country Club, Inc.*, *supra* at 133; *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. at 7, 10 ("It is the rule of this Commonwealth that negligence on the part of a seller or supplier of alcoholic beverages may be shown by a sale or the furnishing of those beverages to a minor, as well as to an inebriated person, as each is proscribed by statute").

Unlike the duty of taverns to refrain from serving obviously intoxicated adults, the duty to refrain from serving alcohol to youths does not depend on whether they are or appear to be intoxicated. A breach of the duty occurs "when the establishment knew or reasonably should have known it was furnishing alcohol to [persons under the age of twenty-one]." *Tobin* v. *Norwood Country Club, Inc.*, *supra* at 135. This is because youths "are thought to be peculiarly susceptible to the effects of alcohol and less able to make decisions about what amount of alcohol they may safely consume in various situations." *Id.* at 136. The jury could have found that the tavern's employees knew that Baker and Lombard were underage when they were

---

[10]Another duty, to prevent harm caused by an obviously intoxicated patron to a member of the public injured away from the premises by the drunk driving of the patron, see generally *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498, 500 (1968), is not directly implicated here.

[11]The duty not to serve alcohol to persons under the legislated age extends also to protect underage patrons from their own conduct. See *Tobin* v. *Norwood Country Club, Inc.*, 422 Mass. 126, 136 (1996); *O'Hanley* v. *Ninety-Nine, Inc.*, 12 Mass. App. Ct. 64, 67 (1981) (when alcoholic beverages are sold by a tavern keeper to a minor, the unreasonable risk of harm to the minor "may readily be recognized and foreseen" [citation omitted]).

admitted and served alcohol — in the case of Lombard, at least four beers, and in the case of Baker, at least one.[12]

The duty to protect patrons also does not require notice of intoxication, but may be triggered when conduct of another patron puts a tavern owner or its employees on notice that harm is imminent. See *Kane* v. *Fields Corner Grille, Inc.*, 341 Mass. 640, 641 (1961) (bartender had observed a boisterous patron engage in "words back and forth," "loud talk," and "a lot of commotion" before the patron charged the plaintiff and landed on him); *Carey* v. *New Yorker of Worcester, Inc.*, 355 Mass. 450, 451 (1969) (patron, who was part of a group at a booth across the aisle from the plaintiff that was "making a lot of noise," "talking loud,"; "getting up and jumping around," shot the plaintiff as he walked). Reasonable steps taken to prevent the harm will discharge the duty — such as, for example, denying service to or "shutting off" a patron who appears intoxicated or who has requested too many drinks, or calling police when a fight occurs or an aggressive patron threatens assault. See, e.g., *Greco* v. *Sumner Tavern Inc.*, 333 Mass. 144, 145 (1955); *Carey* v. *New Yorker of Worcester, Inc.*, 355 Mass. at 452.

We disagree with Father's Too that the duty to protect Christopher ended as soon as he left the tavern. As with the duty to protect third parties from the negligent driving of an obviously intoxicated patron, see generally *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498, 500 (1968), the duty to protect patrons extends to all reasonably foreseeable harm including, in some circumstances, harm that occurs at a distance from the premises. See *O'Gorman* v. *Antonio Rubinaccio & Sons*, 408 Mass. 758, 761 n.2 (1990) (bar owner "has the duty to protect persons on or about the premises from the dangerous propensities of its patrons, served or unserved. When the bar has served a potentially dangerous patron, the duty may extend beyond the premises"). See and compare *Tobin* v. *Norwood Country Club,*

---

[12]That beer consumed by Baker may not have been sold directly to him does not relieve the tavern of its responsibility. See *Tobin* v. *Norwood Country Club, Inc., supra* at 135. Baker testified that he had had only one beer on the night in question; he also testified that during the previous two-year period he had come to the tavern two hundred times for the purpose of drinking as much as he could. The jury could have inferred that on the night in question, Baker drank more than one beer.

*Inc.*, *supra* at 135 (country club's duty extends to an intoxicated teenage patron who left the club on foot and began walking in the breakdown lane of a highway; when other teenagers who had been drinking at the club followed in a van and pleaded with her to get in, she instead walked onto the highway and was struck by a passing vehicle), with *Westerback* v. *Harold F. Le-Clair Co.*, 50 Mass. App. Ct. at 146-147 (no duty to an intoxicated patron who, after leaving the premises of a tavern, was raped by individuals having no connection to the tavern). Cf. *Johnson* v. *Chateau de Ville, Inc.*, 20 Mass. App. Ct. 933, 933 (1985) (while the duty of care does not extend to traffic conditions on a public highway, there may in the circumstances be a duty to design a tavern's entrance in such a way as to take those conditions into account); *Polak* v. *Whitney*, 21 Mass. App. Ct. 349, 351 (1985) (duty to maintain one's premises in a reasonably safe condition and to warn guests of unreasonable dangers of which the owner was or should reasonably have been aware did not end abruptly at the boundary of the property over which the owner exercised control).

In this case, doorman Callinan's observations — words exchanged and dirty looks passed between Ellis and McFadries, Ellis's quick exit to overtake McFadries and Christopher, followed by Lombard and Baker who confirmed that a fight was taking place and then ran to join the fighting,[13] all within sight of Callinan — sufficed to put him on notice that the antagonism between the two groups that began in the tavern had festered to the point of violence. This knowledge, coupled with the doorman's observation of a fight erupting outside the barroom door, triggered a duty, breached by Father's Too through its employee, to take reasonable steps to prevent foreseeable harm by calling police. Indeed, there was evidence that written and

---

[13]The jury could also have considered McFadries's testimony that he told Callinan he thought Ellis was a "loser," as well as Baker's testimony that Ellis was drinking the entire time he was at the tavern; that he appeared to be intoxicated; and that, during the evening, he would leave his companions and then return to give them updates regarding his problems with "some people." The jury could have inferred that Ellis's intoxication would have been evident to employees of the tavern. They need not have believed Callinan's testimony that he was unaware of the continuing animosity between the two groups until Baker confirmed that there was going to be violence.

oral policies of Father's Too required that, in such a circumstance, the doorman should summon police. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. at 13 (liquor store's failure to comply with its own policy to request identification to determine the age of a buyer "is probative on the issue whether it should have known" that the buyer was underage).

3. *Negligence and causation.* Having determined that the tavern was in breach of a duty owed to Christopher, we now consider whether there was evidence to support the jury's finding that the tavern's negligence proximately or legally caused his injuries. See *Cimino* v. *Milford Keg, Inc.*, 385 Mass. at 326, 328-329 & n.6. Questions of negligence and causation are usually left to the jury. See *Zezuski* v. *Jenny Mfg. Co.*, 363 Mass. 324, 327 (1973); *Pucci* v. *Amherst Restaurant Enterprises, Inc.*, 33 Mass. App. Ct. at 785; *O'Hanley* v. *Ninety-Nine, Inc.*, 12 Mass. App. Ct. 64, 68 (1981) ("the question of the proximate cause of the plaintiff's injury is one for the jury").

With respect to the knowing service of alcoholic beverages to underage patrons, the jury could have inferred that the agreement of Baker and Lombard to provide back-up to Ellis, their decision to follow him out the door so that they could catch up with McFadries and Christopher and rough them up, and their subsequent beating and chasing of Christopher into traffic constituted behavior that was influenced by their consumption of alcohol. See *Tobin* v. *Norwood Country Club, Inc.*, 422 Mass. at 140. As to the tavern's failure to protect patrons, the jury could reasonably have inferred that Callinan was on notice when Baker confirmed Callinan's suspicions that there was going to be a fight, and that the situation posed a real danger to patrons of the tavern, including Christopher. Callinan himself testified that it was then that he stepped outside in order to check "to see if they were going to be okay."

"The question whether the risk of injury was foreseeable is almost always one of fact." *Moose* v. *Massachusetts Inst. of Technology*, 43 Mass. App. Ct. 420, 425 (1997). The jury could have found, as previously noted, that up to ten minutes passed between that time and the moment that Christopher was struck by the car, and that, once called, police responded and were at

the scene within two to three minutes. It was for the jury to determine, as they apparently did, that had Callinan taken steps to call police when he observed Baker and Lombard leaving the premises to join the fighting that had already erupted, police would have responded in time to end it, and Christopher would not have been chased into traffic and killed. It was similarly for the jury to determine whether Christopher's death was a foreseeable consequence of the failure to call police. "The specific kind of harm need not be foreseeable as long as it was foreseeable that there would be harm from the act which constituted the negligence, provided it was foreseeable that there would be violence toward others." *Carey* v. *New Yorker of Worcester, Inc.*, 355 Mass. at 454. In these circumstances, we defer to the determination of a properly instructed jury.

We also reject the defendants' claim that the conduct of McFadries, in returning to the tavern street corner to fight when he might have driven on, relieves the tavern of liability for its negligence. The question of what McFadries did, and whether that conduct was negligent, was also a jury question. See Restatement (Second) of Torts § 453 comment b (1965).[14] The defendants do not claim that the jury were incorrectly instructed on the question of intervening cause.

"Even if the defendant could not have foreseen the precise manner in which the injury occurred, '[w]here the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.' " *Lawrence* v. *Kamco, Inc.*, 8 Mass. App. Ct. 854, 858 (1979), quoting from Restatement (Second) of Torts § 442B (1965).

Whether McFadries's conduct was an intervening force or

---

[14]"If . . . the negligent character of the third person's intervening act or the reasonable foreseeability of its being done . . . is a factor in determining whether the intervening act relieves the actor from liability for his antecedent negligence, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, the question should be left to the jury." Restatement (Second) of Torts § 453 comment b (1965).

cause (thereby cutting off liability of the tavern), or whether it was negligence that contributed to the resulting harm (thereby rendering the tavern and McFadries jointly liable),[15] depends upon a number of factors, including, significantly, the timing of the so-called intervening conduct in relation to the tavern's negligence. "An intervening cause is one which comes into active operation *after* the negligence of the defendant" (emphasis original). Prosser & Keeton, Torts § 44, at 301 & n.2 (5th ed. 1984) (intervening force is one "which is neither operating in the defendant's presence, nor at the place where the defendant's act takes effect at the time of the defendant's act," quoting from McLaughlin, Proximate Cause, 39 Harv. L. Rev. 149, 159 [1925]). See Restatement (Second) of Torts § 441 (1965).

Here, the tavern's negligence arose when, after learning that there would be a fight between patrons who had earlier displayed animosity, assisted by underage patrons who were served alcohol and then became pugnacious, Callinan observed that a fight had indeed begun and failed to call police. We cannot say that the jury were wrong to decide as they did.

4. *Christopher's negligence.* The question of Christopher's negligence was also for the jury. In response to special questions, the jury indicated that Christopher was negligent, but that his negligence was not "a substantial factor in causing his own death." There is no merit to the defendants' passing assertion, made without argument or citation to relevant authority, that the jury were, in these circumstances, required to indicate the percentage of Christopher's negligence. That requirement would only have been triggered upon a finding that Christopher's negligence was a proximate cause of his death.

The defendants further argue that "the evidence demonstrates

---

[15]See Restatement (Second) of Torts § 439 (1965): "If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability." Further, "it is not necessary that [the operations of the actor and third person] . . . be absolutely simultaneous. It is enough that the two are in substantially simultaneous operation, as when the effect of the conduct of one or the other has ceased its active operation immediately before the other's conduct takes active effect in harm to the other." Restatement (Second) of Torts § 439 comment a.

that Callinan's failure to call the police was not the dominant cause of the decedent's injury. Callinan could [not] have . . . anticipated . . . that Christopher would provoke a new fight after the initial conflict had come to a halt."

The defendants bear the burden of proving that the plaintiff's negligence was a legal cause of his injury, and only rarely will a court rule as matter of law that a party has sustained that burden. Cf. *Sweenor* v. *162 State St., Inc.*, 361 Mass. 524, 527 (1972). "We do not think that the instant case is one of those 'rare cases.' " *Halley* v. *Hugh Nawn, Inc.*, 356 Mass. 28, 30 (1969). The jury were free to disbelieve Baker's testimony that Christopher joined in the fighting only after a lull — he was the sole witness to testify that the fighting had come to a halt. The defendants' claim does not require the conclusion that Christopher's conduct amounted to negligence that substantially contributed to his own death.

5. *Liability of management company.* We have noted, see note 5, *supra,* that the defendant, Café Enterprises, Inc., a separate corporation, provided management services to Father's Too. On appeal, the plaintiff's theory of negligence with respect to this defendant is that employees of Café Enterprises, Barry Bornstein and Robert Walter, were responsible for supervising the managers of the several bars for which it provided management services, including Father's Too, and for promulgating policies and communicating them to staff. There is no claim that policies were not promulgated. See note 6, *supra.* Rather, the plaintiff argues, employees of Father's Too failed to follow its policies and Café Enterprises, through its employees Bornstein and Walters, should have been aware "that their rules regarding the admission, service, and identification of underage patrons were being ignored" on the night in question.

The problem with this argument is that there was no evidence that either Bornstein or Walter, who were not present that evening, were aware of these failures. Rather, the evidence was that the rules were followed when either was present at the tavern.[16] "The liability of a manager, like the liability of a tavern, is appropriately left to the common law doctrine of

---

[16]The plaintiff appears to claim, without argument or citation to authority, that we should pierce the corporate veil, stating in his brief that "a holding

negligence." *Gottlin* v. *Herzig*, 40 Mass. App. Ct. 163, 167 (1996). See *Addis* v. *Steele*, 38 Mass. App. Ct. 433, 439-440 (1995) (corporate officers not liable by reason of their positions without evidence that they participated in the acts causing injury to the plaintiffs).

"There is no evidence in this case that the . . . managers of the tavern created or contributed to the prohibited" service of underage patrons or to the circumstances that allowed patrons to become violent. *Gottlin* v. *Herzig*, *supra* at 167. "Indeed, there was no evidence that either of the managers was present at the tavern the night of the accident. The plaintiff[] make[s] no argument to the contrary." *Ibid.* The verdict against Café Enterprises, Inc., is without foundation in the evidence and cannot stand.

6. *Punitive damages.* We address the remaining claim that the evidence was insufficient to support a jury verdict that Father's Too was grossly negligent, justifying an award of punitive damages.

Punitive damages may be assessed when death "was caused by . . . the gross negligence of the defendant." G. L. c. 229, § 3. Under long standing Massachusetts authority, see *Altman* v. *Aronson*, 231 Mass. 588, 591-592 (1919), the classic definition of gross negligence is as follows:

> "Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all

---

from this Court [insulating Café Enterprises, Inc., from liability] would be to foster abuse of the corporate form," and making passing reference to Bornstein and Walter as "personally entwined in the daily business of Father's Too." We do not address this claim, see *Nolan* v. *Parker*, 15 Mass. App. Ct. 475, 479 (1983), and note that, in any event, we have been directed to nothing in the evidence to support it.

negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. . . . It falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and intentional wrong. Ordinary and gross negligence differ in degree of inattention, while both differ in kind from wilful and intentional conduct which is or ought to be known to have a tendency to injure."

See *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. at 17, quoting from *Bain* v. *Springfield*, 424 Mass. 758, 767 (1997) (punitive damages appropriate "where a defendant's conduct warrants condemnation and deterrence"). The judge's instructions to the jury were consistent with these principles, and we accept the conclusion of a properly instructed jury on a question within their province.

Here, the jury may have awarded punitive damages because they concluded that the tavern, through its employees, had consistently ignored its legal obligation by repeatedly admitting minors into the tavern, where their identifications would not be further checked so that once admitted, service of alcohol to them was not preventable. The jury could also have concluded that the tavern's neglect of its legal obligation to summon police when it was clear that there would be a fight was exacerbated when Callinan demonstrated indifference to the danger to others by remaining at the door for several minutes, a passive observer as patrons fought on the sidewalk and in the street. See, e.g., *Zavras* v. *Capeway Rovers Motorcycle Club, Inc.*, 44 Mass. App. Ct. 17, 22 (1997) (gross negligence where the flagman in a motor dirt bike race was inattentive to the safety of the participants and merely watched a pileup long enough for three racers in addition to the original fallen racer to go over a jump). "Even where the inattention was only momentary, a jury has been allowed to find gross negligence where the inattention occurred in a place of great and immediate danger." *Ibid.*, quoting from *Dinardi* v. *Herook*, 328 Mass. 572, 574 (1952).

## CONCLUSION

With respect to Café Enterprises, Inc., the order denying the motion for judgment notwithstanding the verdict is reversed, and judgment shall enter for Café Enterprises, Inc. In all other respects the orders and judgments are affirmed.

*So ordered.*