NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-1373                                    Appeals Court

   JOHN E. PARSONS, THIRD, personal representative,[1] vs.  DARIUS
                      AMERI & others.[2]


                      No. 18-P-1373.

      Middlesex.     October 8, 2019. - February 26, 2020.

            Present:  Massing, Sacks, & Hand, JJ.


Practice, Civil, New trial, Instructions to jury.  Negligence,
     Medical malpractice, Gross negligence, Causation.  Medical
     Malpractice.


     Civil action commenced in the Superior Court Department on
July 16, 2015.

     The case was tried before Edward P. Leibensperger, J., and
a motion for a new trial or for judgment notwithstanding the
verdict was heard by him.


     Tory A. Weigand (David M. Gould also present) for the
defendants.
     Adam R. Satin (Julie A. Gielowski also present) for the
plaintiff.

_____

     [1] Of the estate of Laura Parsons.

     [2] Louise Pothier and North Suburban Surgical Associates,
P.C.

MASSING, J.  The plaintiff brought this medical malpractice wrongful death action on behalf of the estate of his late wife, Laura Parsons (Parsons), against a physician, a nurse, and the professional corporation that employed them.  A jury determined that the physician's negligence in performing a surgical procedure resulted in Parsons's death and that the nurse's negligence contributed to Parsons's pain and suffering.  The primary issue in this appeal is whether the evidence supported the jury's finding that the physician's actions amounted to gross negligence, for which the jury awarded punitive damages of $2.5 million.  We affirm.

Background.[3]  1.  The surgery.  Parsons was referred to defendant Dr. Darius Ameri for treatment of a hiatal hernia in her diaphragm.  The diaphragm separates the chest cavity from the abdomen; the hiatus is an opening in the diaphragm that permits the esophagus to travel down through the chest into the stomach.  A hiatal hernia is an abnormality in which the stomach protrudes up through the hiatus into the chest.  Ameri determined that hiatal hernia repair surgery was necessary to restore Parsons's stomach to its proper anatomical position.  He informed Parsons that she needed to lose weight prior to the

---

[3] We recite the evidence as the jury could have found it, reserving certain evidence for the discussion section.

surgery.  A few months later, Parsons was admitted to Winchester Hospital for laparoscopic surgery.[4]

Ameri performed the surgery, assisted by defendant registered nurse first assistant Louise Pothier.  Ameri chose to repair the hiatal hernia by attaching a mesh closure to Parsons's diaphragm with a medical device called the Ethicon Securestrap, which is used during hernia repair surgery to attach prosthetic materials to soft tissue.  Commonly referred to as a "tacker," the device attaches absorbable "tacks" (also called "straps" or "fasteners") through mesh into tissue.[5]  On their own, the tacks are approximately five millimeters in length, but at the time of insertion, the tacker presses them as much as 6.7 millimeters into the tissue.

The manufacturer's instructions for the tacker included several cautions.  A minimum tissue thickness was required, and use of the device was contraindicated if the total distance from the surface of the tissue to any underlying bone, vessel, or organ was less than 6.7 millimeters.  Moreover, it should not be

---

[4] Laparoscopic surgery is performed by making small incisions on the body and inserting long tools to make internal repairs.  Surgeons rely on small surgical cameras during these procedures to see inside body cavities.  Photographs taken by these cameras during the course of Parsons's surgery were admitted in evidence and discussed by the expert witnesses.

[5] We refer hereafter to the Ethicon Securestrap as the tacker.

used to insert tacks "in the diaphragm in the vicinity of the pericardium, aorta, or inferior vena cava during diaphragmatic hernia repair." The pericardium is a membrane containing fluid surrounding the heart; the inferior vena cava and the aorta are the major blood vessels that carry blood to and from the heart.[6]

---

[6] The relevant portions of the instructions appeared as follows:

"CONTRAINDICATIONS

- The device is not intended for use when prosthetic material fixation is contraindicated.

- Do not use the system on tissue that cannot be inspected visually for hemostasis.

- A minimum tissue thickness is required when applying the fastener over underlying bone, vessels, or viscera. If the total distance from the surface of the tissue to the underlying structure is less than the minimum tissue thickness, or may be comprised to a total distance less than the minimum tissue thickness, use of the device is contraindicated.

- This device should not be used in tissues that have a direct anatomic relationship to major vascular structures. This would include the deployment of fasteners in the diaphragm in the vicinity of the pericardium, aorta, or inferior vena cava during diaphragmatic hernia repair." (Emphasis added.)

"WARNINGS

". . .

- The total distance from the surface of the tissue to the underlying bone, vessels, or viscera should be evaluated prior to application and should be a minimum of 6.7 mm."

Ameri testified that he had used the tacker in many hernia repair surgeries.  He preferred to fasten mesh with the tacker because the tacks were less likely than sutures to tear, which could potentially raise the risk of hernia recurrence.  Ameri used the tacker to affix mesh to Parsons's diaphragm crura, that is, the muscular edge of the diaphragm closest to the esophagus.  Although he understood the contraindications associated with the tacker, Ameri stated that the tacker was nonetheless "almost always" used to fix the mesh to the edge of the diaphragm because the crura is so thick that the tacks were "not going to get anywhere beyond this thickness."  Used in this way, the tacker was "nowhere close to," "does not have any relationship whatsoever, or a proximity or getting close," and was "far away from any major vessel or heart or any part of the pericardium."  He admitted that he did not measure the thickness of Parsons's diaphragm crura at the time of the surgery, but he "ballpark[ed]" its thickness to be ten millimeters, thick enough to withstand the five millimeter tacks without allowing them to pierce through the diaphragm.  He agreed that puncturing the pericardium or the myocardium, the heart muscle itself, during hiatal hernia repair surgery would be below the standard of care expected of the average qualified general surgeon.

2. <u>Postoperative complications and cause of death</u>.  After the surgery, Parsons's vital signs were stable.  Two days after

the surgery, however, she complained that her heart was racing and that she had abdominal pain.  An echocardiogram showed the presence of excess fluid in Parsons's pericardium near where the tacks were placed; her heart rate was very elevated and irregular.  She was administered blood-thinning medication and morphine.  Approximately one hour later, Parsons went into cardiac arrest.  She made "raspy, guttural sounds," her breathing became labored, and she was unresponsive except for moaning.  Cardiopulmonary resuscitation (CPR) was performed, but efforts to resuscitate her were unsuccessful.

The provisional autopsy report stated that Parsons's cause of death was "cardiac in nature," caused by blood in the pericardial sac resulting in tamponade -- or compression of the heart due to excess fluid in the pericardium -- likely occurring from prolonged CPR.  The medical examiner produced the provisional autopsy report based on external and internal examinations of Parsons's body.

The final autopsy report, produced after microscopic evaluation of Parsons's heart, noted "puncture marks on the posterior aspect of the heart with hemorrhage just below the level of the cardiac valves," and the presence of 250 cubic centimeters (about eight ounces) of blood in the pericardium.[7]

---

[7] The autopsy report also described the puncture marks as a "superficial cleft like defect in the epicardial fat and

The report noted both "acute and chronic" pericarditis, or inflammation of the pericardium, with "the acute inflammation and hemorrhage likely occurring at the time of hiatal hernia repair."  "Although trauma was considered as a potential cause of the pericarditis, unequivocal evidence of surgical trauma . . . could not be demonstrated."  Parsons did not have a pulmonary embolism, or blood clot, in her lungs, the presence of which could have contributed to irregular heartbeat.  The report concluded, "The final cause of death is ascribed to a combination of pericarditis, myocarditis and hemopericardium" -- that is, inflammation of the pericardium, inflammation of the heart muscle, and bleeding within the pericardial sac -- "with tamponade leading to cardiac arrest."

3.  Plaintiff's expert testimony.  At trial, the plaintiff presented the expert testimony of Dr. Brian Carmine, a general surgeon who had performed nearly 1,000 hiatal hernia surgeries. Carmine testified to a reasonable degree of medical certainty that Ameri and Pothier's treatment of Parsons was below the standard of care expected from the average qualified surgeon and registered nurse first assistant and was a substantial contributing factor to Parsons's death.  Specifically, based on

---

subepicardium," that is, the muscle of the heart.  The report further stated, "The focal defect on the epicardial surface of the posterior left ventricle was superficial with only minimal extension into the [heart muscle]."

his review of the final autopsy report and the photographs from the surgery, Carmine opined that it was more likely than not that Ameri pierced Parson's pericardium and punctured her heart with the tacker, resulting in her cardiac arrest and death.

Carmine was familiar with the tacker Ameri used in the laparoscopic procedure performed on Parsons as well as other techniques for hiatal hernia repair. Injury to the pericardium or any part of the heart muscle should not have occurred if proper surgical techniques were used, and causing such injury during hiatal hernia surgery would violate the applicable standard of care. The average qualified surgeon would have been aware of the risks of using a tacker: "the concern is that when you fire one of these pressure-loaded fasteners, that it can penetrate through and hit structures on the other side of the diaphragm that you can't see, and cause life-threatening injury." Once the stomach was moved down into its correct anatomical position and the hernia was closed or reduced, the back of the heart was just "the thickness of a diaphragm away" from where the tacks were placed; this distance could be as little as three to five millimeters. When asked whether Ameri used the tacker to place tacks on Parsons's diaphragm "in the vicinity of the pericardium," Carmine answered, "Yes. There were some that were concerningly anterior," that is, too close to the front of the chest, near the back of the heart. In

Carmine's opinion, Ameri's choice to use the tacker directly on the diaphragm, when it was very close to the pericardium, was below the standard of care.

Moreover, Carmine testified that Ameri's use of the tacker was directly contraindicated by the manufacturer's instructions, which stated that the tacker should not be used in a "diaphragmatic hernia repair" where tacks are inserted "in the diaphragm in the vicinity of the pericardium." The average qualified surgeon would know or should have known this information, and Ameri's use of the tacker in Parsons's surgery violated the standard of care.

Carmine further testified that it was the surgical tacks that caused the puncture marks on Parson's heart, not CPR as the defendants contended. The puncture marks in the autopsy reports were not consistent with an injury related to CPR but, rather, were consistent with an injury occurring during the surgery. Carmine also noted that Parsons went into cardiac arrest before CPR was performed.

4. Defense's expert testimony. The defendants' theory of the case was that Parsons died of longstanding damage to her heart caused by the hiatal hernia, aggravated by prolonged CPR. Ameri emphatically denied "enter[ing]" Parsons's heart with the tacks during the performance of the surgery. The defense's expert witness, Dr. David Brooks, a general and gastrointestinal

surgeon, opined that Ameri's actions and conduct were appropriate and in accord with the accepted practice of the average qualified general surgeon. He believed that Parsons's death was caused not by an injury during the hiatal hernia repair surgery but rather by the use of blood-thinning medication and attempts to resuscitate her through CPR.

Brooks testified that the tacks did not enter Parsons's heart. He believed it highly unlikely that the tacks could have injured Parsons's pericardium because the puncture marks were "miles away" from where the tacks were placed. Like Ameri, Brooks estimated the thickness of the crura to be approximately ten millimeters. He stated that the location of the hemorrhaging, the location of the tacks, and the technique used to close the hernia and move the stomach back to its proper position all indicated that Parsons's pericardium was not injured during surgery. He also pointed to a sentence in the provisional autopsy report stating that "no surgical penetration of the pericardium was identified." He suggested that Parsons's initially stable postoperative condition was not consistent with someone who suffered a pericardium injury during surgery. He believed that the echocardiogram performed on the second day after surgery would have revealed more fluid in the pericardium if it had been injured during surgery. He also pointed to the autopsy findings of chronic pericarditis and stated that he

believed that Parsons's hiatal hernia was responsible for that condition.  In his opinion, the prolonged CPR caused an injury "that led to bleeding into the pericardial sac."  He stated that the evidence that the CPR broke Parsons's second rib supported his conclusion that it also injured the heart.

Brooks too was familiar with the tacker and the contraindications for its use.  He stated that despite the warnings, he used it routinely in laparoscopic hiatal hernia surgery.  Based on his personal experience and review of the medical records, he opined that Ameri's use of the tacker was appropriate for Parsons's procedure "if used wisely and safely."  In his opinion, "the warnings that are on the package insert are largely a defensive maneuver" by the manufacturer so "it would not be involved in litigation."  He added, "[I]f you look at the package insert next time you buy [ibuprofen], you'll be horrified of the number of complications that could possibly occur."

5.  Verdict and posttrial motion.  After a six-day trial, the jury found that Ameri and Pothier were negligent in their treatment and care of Parsons, that Ameri was grossly negligent, that Ameri's negligence was a substantial contributing factor in causing Parsons's conscious pain and suffering and death, and that Pothier's negligence was a substantial contributing factor in causing Parsons's pain and suffering but not her death.  The

jury awarded $100,000 to the estate for Parsons's conscious pain and suffering; $1.5 million to the plaintiff in his individual capacity and $500,000 each to Parsons's son and daughter, to compensate them for past and future loss of consortium; and $2.5 million punitive damages against Ameri for his gross negligence.[8] After judgment entered, the defendants filed a motion seeking a new trial or judgment notwithstanding the verdict; in the event neither of those requests was granted, the defendants sought exclusion of prejudgment interest on the damages awarded on the gross negligence claim and remittitur of the damages awarded. The judge denied the requests for a new trial or judgment notwithstanding the verdict, but he allowed Ameri's request to amend the judgment to exclude any prejudgment interest on the punitive damages award. The request for remittitur was also denied. An amended judgment then entered.[9]

---

[8] The parties stipulated, before the case was submitted to the jury, that Ameri and Pothier were at all relevant times employees of defendant North Suburban Surgical Associates, P.C., and that the corporation would be vicariously liable for the negligence of its employees.

[9] The amended judgment entered on June 28, 2018. The defendants' notice of appeal, dated June 29, 2018, states that they appeal from the judgment entered on June 1, 2018 (not the amended judgment dated June 28), and from the order on their motion entered on June 27, 2018. As nothing turns on this oversight, we treat the defendants' appeal from the judgment as one from the amended judgment.

Discussion. 1. Causation. The defendants contend that the trial judge erred in denying their request for a new trial because the verdict, particularly as to causation, was against the weight of the evidence. "The judge should only set aside a verdict as against the weight of the evidence when it is determined that the jury 'failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.'" O'Brien v. Pearson, 449 Mass. 377, 384 (2007), quoting Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 520, cert. denied, 493 U.S. 894 (1989). See W. Oliver Tripp Co. v. American Hoechst Corp., 34 Mass. App. Ct. 744, 748 (1993) (to conclude that new trial is warranted, judge must find "the verdict is so markedly against the weight of the evidence as to suggest that the jurors allowed themselves to be misled, were swept away by bias or prejudice, or for a combination of reasons, including misunderstanding of applicable law, failed to come to a reasonable conclusion"). We review the denial of the defendants' motion for new trial for abuse of discretion, see O'Brien, supra, extending "considerable deference" where the trial judge and motion judge were the same. Gath v. M/A-Com, Inc., 440 Mass. 482, 492 (2003).

"To prevail on a claim of medical malpractice, a plaintiff must establish the applicable standard of care and demonstrate both that a defendant physician breached that standard, and that

this breach caused the patient's harm."  Palandjian v. Foster, 446 Mass. 100, 104 (2006).  To establish causation, the plaintiff must demonstrate a causal connection between a defendant's negligent actions and the injuries suffered.  See Glicklich v. Spievack, 16 Mass. App. Ct. 488, 492 (1983). "Testimony that such a relation is possible, conceivable, or reasonable, without more, is insufficient to meet this burden." Id. at 492-493.  The jury had to determine, based on a preponderance of the evidence, that if Ameri and Pothier had provided proper care, Parsons "would not have been injured to the same extent."  Id. at 493.

The judge found that "[t]here was credible evidence . . . to allow a jury reasonably to conclude that defendants' negligence caused the injuries and death," and "there is nothing to suggest that the jury in this case [were] biased or prejudiced or that they misunderstood the facts or law presented to them."  We agree.

The jury heard testimony from expert witnesses and the defendants; they viewed photographs from Parsons's surgery and were led through the preliminary and final autopsy reports in detail.  The plaintiff's expert witness, Carmine, offered his opinion that Ameri caused Parsons's death by puncturing her heart with the surgical tacker, causing her pericardium to fill with fluid and constrict her heart, and that Parsons would not

have died if Ameri had provided the standard of care of the average qualified surgeon.[10]  His opinion was consistent with the final autopsy report, which found "puncture marks on the posterior aspect of the heart" and "acute inflammation and hemorrhage likely occurring at the time of hiatal hernia repair," and concluded that the cause of death was "a combination of pericarditis, myocarditis, and hemopericardium with tamponade, leading to cardiac arrest."

The jury also had a substantial basis on which to reject the defense theory of the case.  Both experts agreed that injuries to the pericardium may not result in abnormal vital signs until days after the injury occurs.  Carmine explained why he concluded that Parsons's death was not caused by preexisting

---

[10] Carmine also testified that Pothier departed from the standard of care of the average qualified registered nurse first assistant because she either was ignorant of the relevant anatomy and risks of the surgery, or failed to inform Ameri that he was operating too close to a vital organ, and if she had met the standard of care, it is more likely than not that Parsons would have lived.  Although there was thus evidence that Pothier's negligence caused Parsons's death, Pothier argues on appeal that there was no independent evidence that her negligence caused Parsons's conscious pain and suffering.  The evidence, however, allowed the jury to draw that inference. They heard evidence that Parsons suffered abdominal pain and rapid heartbeat, and that she had difficulty breathing before she succumbed.  It was reasonable for the jury to infer that the same conduct that caused Parsons's death also caused her pain and suffering immediately before she died.  The verdict against Pother is not inconsistent with the verdict against Ameri; if anything, it indicates that the jury found Pothier less culpable than Ameri.

heart defects or prolonged CPR.  He believed that CPR did not cause the puncture marks because there was no other damage to the structures surrounding the heart.  Rather, Carmine believed that Parsons's pericardium was injured at the time of the surgery because there were signs that it had begun to heal.

The jury's conclusion that in the course of the surgery Ameri punctured Parsons's pericardium, leading to internal bleeding and ultimately causing her death, was reasonable and supported by the evidence.  The judge did not abuse his discretion in denying a new trial on the issues of negligence and causation.

2.  Gross negligence.  Ameri contends that the trial judge erred by denying his motion for directed verdict and request for judgment notwithstanding the verdict on the question of gross negligence, and that the judge also erred by denying a new trial on the issue.  When reviewing the denial of a motion for directed verdict or judgment notwithstanding the verdict, we apply the same standard as the trial judge.  O'Brien, 449 Mass. at 383.  "Review of these motions requires us to construe the evidence in the light most favorable to the nonmoving party and disregard that favorable to the moving party."  Id.  "Our duty in this regard is to evaluate whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made

in favor of the [nonmovant].'" Id., quoting Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 121 (1992).

a. Instruction on gross negligence. The judge instructed the jury in the language of the "classic," Christopher v. Father's Huddle Cafe, Inc., 57 Mass. App. Ct. 217, 230 (2003), and "long-standing definition of gross negligence in Massachusetts," Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 410 (2013), derived from Altman v. Aronson, 231 Mass. 588, 591-592 (1919). For the first time on appeal, Ameri contends that the Altman language is "confusing, unhelpful, and ill-suited to medical malpractice claims" because it does not provide guidance concerning how far from the degree of care and skill of the average qualified practitioner a defendant must deviate to amount to gross, as opposed to ordinary, negligence. See Johnson v. Omondi, 294 Ga. 74, 84 (2013) (Blackwell, J., concurring) (suggesting "that we articulate the 'gross negligence' standard in a different way in medical malpractice cases, so as to focus more explicitly upon the accepted standards of medical care against which 'gross negligence' must be measured in such cases").

We decline to address this claim. While Ameri opposed the issue of gross negligence being submitted to the jury, he did not object to the Altman instruction. To the contrary, when the judge specifically asked defense counsel about the proposed

language for the instruction, counsel replied that it was "fine." Indeed, the defendants cited Altman as the governing standard in arguing that the gross negligence verdict was against the weight of the evidence. Because they never brought this argument to the trial judge's attention, it is waived. See Aleo, 466 Mass. at 403 n.11; Jarry v. Corsaro, 40 Mass. App. Ct. 601, 603-607 (1996); Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974).[11]

b. Evidence of gross negligence. Under Altman, 231 Mass. at 591-592, "[g]ross negligence is substantially and appreciably higher in magnitude than ordinary negligence. . . . It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. . . . It is a heedless and palpable violation of legal duty respecting the rights of others. . . . Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence." The "voluntary incurring of obvious risk" and

---

[11] We are not persuaded by the defendants' contention that we should overlook the waiver because any objection to the time-honored Altman instruction would necessarily have been futile. See, e.g., Commonwealth v. Russell, 470 Mass. 464, 474 (2015) (trial judge did not err in departing from instruction in Commonwealth v. Webster, 5 Cush. 295, 320 [1850], on proof beyond reasonable doubt). In any event, we think it unlikely that a more targeted instruction on gross negligence would have affected the verdict.

"persistence in a palpably negligent course of conduct over an appreciable period of time" are among "the more common indicia of gross negligence."  Lynch v. Springfield Safe Deposit & Trust Co., 294 Mass. 170, 172 (1936).  Moreover, "when the injury likely to ensue from a failure to do that which ought to be done is a fatal or very serious one, what otherwise would be a lack of ordinary care may be found to be gross negligence."  Renaud v. New York, New Haven, & Hartford R.R. Co., 206 Mass. 557, 560 (1910).  See Williamson-Greene v. Equipment 4 Rent, Inc., 89 Mass. App. Ct. 153, 157-158 (2016).  "The judge's instructions to the jury were consistent with these principles, and we accept the conclusion of a properly instructed jury on a question within their province."  Christopher, 57 Mass. App. Ct. at 231.

Few published appellate cases have discussed the application of the gross negligence standard in the medical malpractice setting.  In Matsuyama v. Birnbaum, 452 Mass. 1, 37 (2008), the court, citing Altman, 231 Mass. at 291-292, summarily stated that the issue of gross negligence was properly submitted to the jury based on evidence that the decedent's doctor had "missed or ignored [the decedent's] known risk factors for gastric cancer for a period of almost four years," and on the doctor's admission that the payment structure of his practice made it difficult for him to provide patients such as the decedent with optimum medical care.  In that case, however,

the jury found for the defendant on the question of gross malpractice; his objection was based on the premise that by instructing the jury on gross negligence, the jury would be more likely to find him liable in negligence. Id. at 36-37. As "[e]ach [gross negligence] case must be decided upon its own peculiar facts," Peace v. Gabourel, 302 Mass. 313, 316 (1939), we turn to the evidence before the jury.

The jury could reasonably conclude that Ameri's decision to use the tacker in close proximity to Parsons's pericardium exhibited the hallmarks of gross negligence:  he voluntarily incurred an obvious risk, in circumstances where the failure to exercise reasonable care could be fatal.  The plaintiff's expert, Carmine, testified that given Parsons's anatomy and the tacker's contraindications, use of the tacker constituted an obvious risk.  In the photographs taken during surgery, Carmine noted that Ameri had placed some tacks "concerningly" close to the pericardium.  The point where Ameri inserted the tacks, which extend 6.7 millimeters when employed, was "the thickness of a diaphragm" away from the heart, which could be as little as three to five millimeters.  Carmine explained that the risk is obvious to surgeons performing this procedure "because you can actually see the heart beating through the diaphragm right where you're working."  In these circumstances, the jury could take Ameri's admission that he did not measure the thickness of

Parsons's diaphragm crura at the time of the surgery, instead estimating it to be approximately ten millimeters, as indicative of gross negligence.

Moreover, the dangers associated with using the tacker were well known to the average qualified surgeon, even without the manufacturer's warning: "the concern is that when you fire one of these pressure-loaded fasteners, that it can penetrate through and hit structures on the other side of the diaphragm . . . and cause life-threatening injury." Witnesses for both parties agreed that alternative methods were available. Exacerbating Ameri's negligence was the fact the manufacturer's contraindications warned against using the tacker exactly where he used it: "in the vicinity of the pericardium, aorta, or inferior vena cava during diaphragmatic hernia repair." The judge, in denying the defendants' posttrial motion, cited this fact as the reason he submitted the question of gross negligence to the jury: "Dr. Ameri ignored the specific direction given for use of the instrument."

Ameri argues in his brief that because the manufacturer's use of the phrase "in the vicinity" is inexact, the contraindication leaves it to the judgment of the surgeon to determine whether and where the tacker can be used safely; he maintains that he reasonably exercised such judgment here. This, however, was not the approach that he took at trial.

Rather, Ameri testified that the use of the tacker on the diaphragm crura is always acceptable. In closing argument, his attorney referred to the defense expert's testimony that "the tacker is absolutely safe to use in these circumstances, and that [the expert] uses it in every case." Counsel further asserted that the manufacturer's contraindication "is really a self-serving document to prevent the manufacturer from getting sued." The jury could have accepted the defense theory that the manufacturer's warnings could be dismissed and that Ameri did not injure Parsons in any way. However, the evidence also permitted the jury to find, as they did, that Ameri heedlessly ignored the manufacture's warnings, with catastrophic results. See Altman, 231 Mass. at 591 (equating gross negligence with "heedless and palpable violation of legal duty").[12]

While drawing the line between ordinary negligence and gross negligence can be difficult, see Williamson-Greene, 89 Mass. App. Ct. at 158, "the distinction [between them] is well established and must be observed, lest all negligence be gradually absorbed into the classification of gross negligence." Quinlivan v. Taylor, 298 Mass. 138, 140 (1937). Conceding that

---

[12] Ameri similarly argues that the judge erred by failing to give the jury any instruction on whether or how the manufacturer's warnings could be considered as evidence of gross negligence. This argument, never raised at trial and asserted for the first time in the defendants' reply brief, is waived. See Truong v. Wong, 55 Mass. App. Ct. 868, 878 (2002).

the plaintiff's expert would not have been permitted to opine that his conduct amounted to "gross negligence," see Puopolo v. Honda Motor Co., 41 Mass. App. Ct. 96, 98 (1996), Ameri nonetheless contends that the jury could not permissibly reach a verdict on the issue without expert testimony, based on "factual and medical consensus," that Ameri's conduct was not just below the applicable standard of care, but also was "a flagrant and egregious departure." We disagree. The evidence, including the plaintiff's expert's testimony, provided the jury with a reasonable basis to distinguish ordinary negligence from gross negligence in this case. It was uncontested that injuring the patient's pericardium or heart muscle during hiatal hernia repair surgery would violate the standard of care for the average qualified surgeon. The evidence as a whole permitted the jury to find that Ameri's use of the tacker in Parsons's surgery manifested many of the common indicia of gross negligence. See Rosario v. Vasconcellos, 330 Mass. 170, 172 (1953), quoting Lynch, 294 Mass. at 172 ("some of the more common indicia of gross negligence are set forth as 'deliberate inattention,' 'voluntary incurring of obvious risk,' 'impatience of reasonable restraint,' or 'persistence in a palpably negligent course of conduct over an appreciable period of time'").

To be sure, in determining whether a finding of gross negligence is warranted, the defendant's conduct must "be considered as a whole." Duval v. Duval, 307 Mass. 524, 528 (1940). See Williamson-Greene, 89 Mass. App. Ct. at 157. In this regard, Ameri contends that he provided considerable and attentive care to Parsons over the course of her treatment. But even if Ameri's "inattention was only momentary, a jury has been allowed to find gross negligence where the inattention occurred in a place of great and immediate danger." Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 22 (1997), quoting Dinardi v. Herook, 328 Mass. 572, 574 (1952). Such is the case here.

In denying the defendants' request for new trial or judgment notwithstanding the verdict, the judge found that the jury's verdict of gross negligence "was reasonably justified by the evidence that Dr. Ameri proceeded to use the tacker in this surgery despite the explicit contraindication. It could reasonably be found that he voluntarily subjected Laura Parsons to an obvious risk when there were alternatives to the use of the tacker." For this reason, he declined to disturb the jury's finding of gross negligence. We discern no error in submitting the question to the jury, and no abuse of discretion in the determination that the verdict was not against the weight of the evidence.

Amended judgment affirmed.